Good morning. I would like to draw the court's attention to a decision that was recently released. It was April 22, 2011, and the case is Cooletti v. City of Los Angeles. And the reason we believe this, it's a second district court of appeal in the state of California. We believe this decision is relevant to today's case because it further helps to explain the necessary standard under a reasonable accommodation clause of action. In this particular case, what the court does is it describes the importance of the affirmative duties that an employer has in order to accommodate an employee. And we think that this case Have you notified us of this case? I have not, Your Honor. You're supposed to do that, you know. You're right, Your Honor. What? You are correct, Your Honor. You have to send us a letter and all that. You're right, Your Honor, and I did not find out this case until, unfortunately, when I began. You should write down and give it to the court and deputy the citation, please. I will, Your Honor. We'll give you a gum sheet. Thank you, Your Honor. It's so recent it doesn't actually have, it doesn't have its official citation, but I will give. Well, but we, you know, the name, number, we've got plenty of ways of getting a hold of it. This is correct, Your Honor, and I do appreciate that. I apologize for not following proper. When did it come down? It came down April 22nd, which is last week. Last week. So, it will be Friday, I believe. That's okay. That's okay, don't worry about it. All right, thank you, Your Honor. The reason why this case, we believe, is important is it talks about the affirmative duties of the employer. And one of the things that we believe that is so crucial in this particular case is the idea that the employer has an obligation to provide a reasonable accommodation. And the California regulations and statutes are clear that a reasonable accommodation is not, for example, as Federal Express contends, filling out or partially filling out a job description or a job application. A reasonable accommodation is offering someone either leave time or, as we contend, offering that person a position that the person can perform. Can you zero in on that then? Because your argument rests heavily on the notion that FedEx should have been taking the restrictions and looking at its inventory of jobs, which, you know, it's the one that knows what kind of jobs it has, and trying to find out what, if any, jobs would fit the medical restrictions that your client had. Isn't that your position? That's correct. Okay, so in light of that, the court found, as I understand it, that that's essentially what the process that FedEx went through, I forget the woman's name, but she was going through and got the statement from Ms. Thomas' doctor saying she had the various restrictions, and she characterized them as not fully stabilized, not fully finalized, but that they were permanent. And I don't want to misquote the actual language, but whatever. And that with that in hand, she was going through the process of trying to identify jobs within the organization. Now, your expert came in, as I recall, and said, well, with the 75-pound limitation that presumably ruled a number of these jobs out, that's a, I think, a weasel factor, he called it. So can you just clarify what your theory is in light of what, you know, in other words, you said they should have followed a process. It seems that they did follow the process. Tell me what you think that's wrong, and then what you think Ms. Thomas could have qualified for. Well, Your Honor, we believe, the plaintiff contends that what could have happened, first of all, was an extension of her leave time to have allowed more time to review available positions, for example. For whom to review? Well, be it Federal Express, Nancy Hammond, I believe was the manager, correct, or Ms. Thomas herself. But the fact of the matter is that she submits, and Federal Express said she had to submit this doctor's note. She had approximately 17 days from the date of termination from when she submitted the doctor's note. But she was told two and a half months before that to submit the doctor's note. Yes. And the record is sharply disputed as to the reasons why a doctor's note was not submitted. And the expert also testified or provides the idea. The dispute doesn't involve, as I understand it, the dispute is that she was trying to, I don't know what she was doing, but whatever it was, it wasn't FedEx that was involved in her not submitting the doctor's note, was it? Well, but as Michael Robbins also discusses of the expert, that the 2006 doctor's note could have served in lieu of that. I don't understand that part, because it was two years later. What does it say? Presumably she was getting better for two years or she wasn't, but it doesn't say anything about her situation two years later. Well, the notes are identical, but they're substantially similar, Your Honor. Of course, that may be what turned out, but it isn't what was the case. There's no way FedEx would have known that. But, Your Honor, FedEx also had the option to have had Ms. Thomas go to one of their own doctors. If they were so concerned about the immediate need for a doctor's note, FedEx can send them to a doctor of their choosing to have restrictions created. Is it unreasonable in some way to think that she's been under a doctor's care all this time, and they want to know what her doctor thinks about what work she can do so they can try and work with her to find a job? Is that not an unreasonable position? I don't think that's an unreasonable position, Your Honor. What I do think is unreasonable is them saying you're going to be fired in 17 days because there isn't enough time to look for appropriate positions. So the record is that she was fired at a date certain. And the case law talks about the idea that this is per se discriminatory. They have a date certain in terms of a finite leave period instead of a leave period that is tailored to the individual needs of the particular employee. But she'd been out 30 months already, right? She had been out for a long time. Thirty months is a long time, Your Honor. But for her, it was required due to the nature of her injuries. Dr. Kagan was putting her out continuously on leave because the nature of her injuries required such a long time. For other people, that may have not been the case. But the fact of the matter is that FedEx had a one-size-fits-all leave policy that did not fit the circumstances of Ms. Thomas. So as a result of that, when she finally did get the doctor's notice, Ms. Thomas … Her total leave period, what, ran it up? It was a long time, wasn't it? Well, there were other injuries. Yeah, but what are the total? Your Honor, I don't know. Hundreds and hundreds. Hundreds of days. Hundreds of days. Hundreds and hundreds of days. She was injured a lot at FedExpress. And I don't want to say that, you know, whether she was prone to injury, whether FedEx has extremely difficult jobs, I don't … The fact of the matter, she was injured numerous times. But the issue, again, and this is from the Madoff case, the Madoff-Rabbi versus Neiman Marcus case, is that we look at there's an obligation to reasonably accommodate and to engage in the interactive process continuously. So Plaintiff Thomas is not contending that FedExpress did not accommodate her on her other, you know, multiple leaves. What we're contending is that they failed at the very end and terminated her instead of giving her additional time, for example, to look for available and suitable positions. The other factor, and this is noted in the reply brief, is that Ms. Thomas actually requested two specific positions. Those were the import-export position and the courier-handler position in the Van Nuys station. And those positions were reasonable accommodation requests that were never addressed by FedExpress. So as a result of that, what you have is you have positions that she specifically requested as reasonable accommodation. FedExpress doesn't. And in what form and when did she request those? She requested those from Miriam. Actually, she submitted for those positions with the manager from Van Nuys and notified Miriam Rain, who was the manager, I believe, by phone. And as a result of that, FedExpress did not follow up on that. And when was that? Those were in the crucial 90-day period that she's prior to being terminated. Those were then vacant jobs or not then vacant jobs? My understanding is those were both vacant jobs at that time, yes, Your Honor. So the issue, then, is that these positions are available and FedExpress does not consider her for these positions or, more accurately, says that, and I believe the reason why those were not done is I think Miriam Rain was unavailable for a week, if I remember correctly, in the record. But that's on page 8 of the reply brief in the third paragraph. So we have this idea that reasonable accommodation requests are being made by Ms. Thomas and they're not being fulfilled by FedExpress. But more importantly, we also have the concept that there isn't an interactive process that's being provided to Ms. Thomas. And as a result of that, FedExpress fails in its obligations here on both parts of that test. Why don't we hear from Ms. Thomas? I'll use this. Good morning, Your Honors. May it please the Court. I'm Craig Lindberg. I represent Federal Express Corporation. Ms. Thomas claims that FedEx failed to engage in the interactive process and failed to accommodate Ms. Thomas. Nothing could be further from the truth. The undisputed facts in this case are replete with evidence that FedEx did everything it could and in its power to accommodate Ms. Thomas, but that Ms. Thomas failed to engage in the interactive process and rebuffed our efforts to accommodate her. What about this last representation that she did specifically ask for certain jobs and that there was no process around those two jobs? That's correct. That's in a phone telephone conversation that she had with Miriam Rain. There's two problems with that, Your Honor. The one is a courier handler position. She was a courier previously. It's undisputed that she could not perform the essential functions of a courier because you have to lift packages. FedEx is a package delivery company. We deliver packages up to 75 pounds. Her limitations were she couldn't move, push, pull, or lift 5 pounds. And is a courier handler position the same as a courier handler position? Yeah. A handler position is what the packages come in through the facility from the airport and they go down ramps and pulleys and belts, and they're picked up and then they're placed into the trucks. That's what the handlers do. So she was disqualified from doing either one of those positions, and it's undisputed in this case. She apparently disputes it, and she apparently says that there could have been accommodations that would have enabled her to do it. And did anybody ever go into that? Did Ms. Rain ever say, well, can you explain to me what reasonable accommodation would enable you to do that job? Did Ms. Rain ever get into a dialogue with her about the requirements of the job and how she could be accommodated for them? Yes, she did, Your Honor. I don't know if that specific job was discussed, but after FedEx received the very limiting and severe restrictions in the end of April or early May of 2008, Mary Rain looked through all the available positions, including courier positions, including a list of ten. But it strikes me that your major position is that she never identified a job or applied for one. And there is now, and I didn't realize this until we went on, that it does appear that there was at least one job that she wanted to put in for and another one she said she wanted to put in for. So she did identify two jobs. Now, I understand you say the record supports the fact that she's not, that she couldn't be accommodated in that, but that's a little different than whether there was engaged in an interactive process with regard to them. Well, there was an interactive process, Your Honor. With regard to those two jobs? Absolutely. The first one with the import-export agent, that was one of the positions that Mary Rain submitted an application on her behalf, sent her a letter to that effect, and documentation asking her to submit an accommodation request form to her doctor and send it back to FedEx so that we could look at how we could accommodate her. As the record reflects, she never returned that document. She never signed the application. We gave her additional time within which to respond to us, and she never did. Because of operational necessity, we had to fill that import-export position. With respect to the courier position, it's undisputed and undisputed fact number six that she couldn't perform that position. Even when we got the severe limiting restrictions at the start of May, Your Honor, Ms. Rain called Ms. Thomas to discuss her restrictions and the available positions. They went through position by position and tried to get their heads together, engaging in the interactive process to determine what jobs she could perform, the essential functions, with or without accommodation. Ms. Rain couldn't come up with any, and Ms. Thomas couldn't come up with any accommodations. That's in paragraph 25 or 26 of Mary Rain's declaration. Also, a lot of those jobs were vacant or, I'm sorry, were not available in the Los Angeles area because it's undisputed Ms. Thomas did not want to look for jobs outside of the Los Angeles area. So there's no credence to the argument that those two jobs were available and or that she could perform the essential functions of those jobs. And it is the plaintiff's burden to show that she could perform the essential functions of those jobs. Ms. Thomas also talks about Mr. Bennett's ---- That's the courier position, correct. What the essential elements were. What about the other jobs? How was she to know what the essential elements were? Ms. Rain sent her all the available positions on a weekly basis for 90 days, and with those available job positions throughout the United States, she sent the requisite job descriptions for each one of those jobs. But the job descriptions don't necessarily demonstrate the essential job elements. Well, I think they include all the essential job elements. Some might argue ---- Correct. She had a 1-800 toll-free number, and during the last 90 days there's eight conversations that she had with Ms. Rain to discuss the available positions and whether she could be accommodated to perform the essential functions of any of those positions with or without reasonable accommodation. And during that whole 90-day process, neither Ms. Rain nor Ms. Thomas could come up with a single accommodation or a single position that she could perform with or without reasonable accommodation. So just so I understand what you were saying about the export-import position, there the hang-up was that they had a conversation about whether Ms. Thomas could perform the essential functions, and Ms. Rain wanted the doctor's input on that? Correct. When we sent out the job application, we sent to Ms. Thomas and all other disabled employees, we sent them a request for accommodation form. Now, remember, this is before we received the very limiting restrictions. We were trying to accommodate Ms. Thomas by getting the ball rolling to begin with. And it comes with a form that they provide to the doctor that says, how can the employee be accommodated in this position? What are the limiting ---- Okay. Let's just get to the point. I want to focus on export-import. That's a job she identified. The doctor isn't going to know in his office what FedEx thinks, what accommodations, tailoring of the essential functions can be accomplished. All he can do is provide response, I think, would think, to FedEx saying, okay, she has to do all these elements. There could be interaction on that. Where did his medical opinion interplay with what FedEx's side of the equation was? Well, if I understand your question, there's a point in time in May, May 1 or April 29th, we get the actual restrictions, the updated restrictions I'll call them. When we sent the request for accommodation back in either February or March, we didn't know what her restrictions were. I understand. But when did the export-import job come on the table? Prior to receiving her updated restrictions in April and May of 2000. Okay. And when FedEx got that, was the export-import job still open? The import-export job was not available. Okay. By then it had been filled. Correct. For operational necessity. Correct. But Ms. Raines had asked before that time, before the May information from the doctor came in, she'd been asked to provide that kind of information so that FedEx could evaluate whether she could do the export-import job. That's what you're saying? Correct. Because at that time we didn't know what her restrictions were. It had been almost two years later. Also, Your Honor, one thing that Ms. Thomas focuses on in their briefs, they look at the 75-pound limitation or the requirement and the fact that she couldn't lift more than five pounds. But there's four other very severe restrictions that she had. She couldn't work next to moving machinery parts.  And she couldn't have fine right-hand manipulation for repetitive manipulation because her right hand. So that took her out of a lot of the data entry and the typing because she couldn't do repetitive fine manipulation with her right hand. And she was right-handed. So it's not just the 75-pound requirement and the fact that she couldn't lift or push or pull more than five pounds. It also had to do with the other restrictions that we had. We're a moving company. We have conveyor belts and moving machinery parts that process these packages throughout our facilities. And if she can't be next to moving machinery parts, she can't type or input data entry, or she can't be next to fumes, odors and gases, which all these different machines emit, then she can't perform the essential functions of a new job. What about the claim that it would have been an appropriate accommodation to at least extend the time period because she wasn't actually yet declared permanently disabled and things could have improved? Well, there's two issues on that. One, it's actually not factually correct. We received a note from Dr. Capon, or the note was dated April 7th, that said she was permanent and stationary as of April 7th, 2009. Also, under the case law, a disability is considered permanent if the condition has been stationary for a reasonable period of time. Here we know that the restrictions in 2006 that we received not only stayed the same, but they got worse over that two-year period. So under Dr. Capon's note of April 7th, or under the case law, she was permanent and stationary for two years, and in fact, her condition deteriorated. I forget what your other question was, Your Honor. I think that was it. Okay. Thank you very much. Thank you. I just have a very short period. But what I wanted to address, Your Honor, is the idea that the import-export position was filled prior to Ms. Collins getting an opportunity to apply for that. And what Federal Express says is it was operational necessity was the reason for it being filled. That is different, materially different, from an undue hardship standard. We can't just take their word for it that it needed to be filled immediately, and that is what Federal Express is asking you to do. Instead of looking at the position and saying — Well, combined with the fact that she didn't get her application papers in and she didn't get the doctor's note in and so on. Precisely, Your Honor. We should have been given the opportunity to have applied fully for that position. It would have been perfectly appropriate if there was such an operational necessity to put someone there in temporarily until that — until Ms. Thomas could be fully — What was the state of play at that point? I mean, I gather the state of play was they sent her an application. They said, here's an application. Here's an accommodation form. We need your doctor's note. And nothing came back. Well, Dr. Capon delayed on the doctor's note. And the reason for that is he was waiting for the independent — plaintiff contends — the independent medical report of the medical center. Did she get back to them and say, you know, I won't — I'll have it next week. I don't have it this week. She went to Dr. Capon numerous times. Did she get back to FedEx and say, I explained the delay in applying and the delay in getting the accommodation note request and the delay in getting the doctor's notes in? She was in communication with Ms. Rain. I explained the situation. As far as this particular job. For this particular position, she was — the record I do not know has anything about that, Your Honor. What I do think the record establishes is that Ms. Thomas is trying to apply for positions. She is trying to meet the requirements that Federal Express is saying things to me. But you said that it was inappropriate to give this job away rather than hold it open. And my question is, did she give anything — did they have any indication from her that she was going to follow through on it? Yes. And that was because she was saying she's going to get her doctor's note. She was saying she's getting her doctor's note to get for Federal Express from Dr. Capon. So she did have an indication that she was providing that to Federal Express. For that particular job that she was going to apply for that, she was actually going to send in an application for that job? She addresses that she filled — you know, she called in or sent in for the application — sent in for that position, said she's applying for it. She did do that? Well, that's — the note that Miriam Rain has in her telephone log is that, yes, Karen Thomas initiated the application for that by talking to the Van Nuys manager. So that's what's so crucial about that. It wasn't Miriam Rain taking it. That may have been independent. But it's Karen Thomas who's initiating the conversation with the Van Nuys manager for that position. And she also got back to them and said, I'll be getting the doctor's notes. I just don't have them yet. She was in communication with Federal Express trying to explain her situation, yes. So that is correct. We believe that Ms. Thomas was doing what she was required to do. And the reason for not getting the doctor's note in promptly, you think he could just go to the doctor and say, fill out the note? The doctor didn't fill out the note. But apparently because of what? Because he was waiting for a crucial report in the workers' compensation area from the defense — or, excuse me, from the independent medical examiner. And he was waiting to be able to confirm his restrictions to make sure they were accurate. That is why I understand Dr. Capon delayed on the note. Having said that, there wasn't — the record does not establish there was the quote-unquote operational necessity of filling that position. Federal Express just simply asserts that. So why can't that position, for example, a temporary person be put in that position until Ms. Thomas can be considered fully, until her restrictions? The other issue is that, again, Federal Express could send her to a doctor if it was so important that that could be done immediately. They could have sent her to a doctor to have her restrictions evaluated by another doctor. So the issue we're faced with, we're confronted with, is Ms. Thomas doesn't have all the resources. It's Federal Express that has the resources as the employer. And she's being left to evaluate these positions, and Federal Express is not necessarily giving her all the support that she needs to be able to see what positions she can apply for. And Mr. Robbins' report is very crucial about the idea of reverse engineering positions based upon restrictions. So there are failures of Federal Express in terms of engaging Ms. Thomas to find and be able to put her in a position that was asked before. Thank you. Thank you. We did look together at various possible positions. Ms. Rainey and the other lady. Ms. Rainey and Ms. Thomas did go through a list. But keep in mind, Federal Express puts these positions, vacant positions out every week. Okay? They look through maybe two because she only had 17 days. So why not extend the leave and have her look through more? That's the crucial issue in terms of extending the leave to provide her more opportunities for positions as they become vacant. But what about her delays in responding? And it just seems to permeate this record. Her delays in responding, Your Honor, and I think you're referring to most crucially the doctors and others, are not necessarily her own fault. But second of all, there are solutions for ways of getting around that, Your Honor. So you're saying she called and said, I'm interested in this position. The doctor is delaying the report. My understanding is that she... I mean, where's that in the record? Well, you can just give us a little note. I'll submit a letter of brief on that. In the record, you got it here. Just give it to the clerk over here. I'll do that, Your Honor. He has a gum sheet. All right? All right, thank you. How much time you got left? I don't think I have any. He's still... No, it's on the wrong side. On the wrong side. Thank you. All right. All right, we're going to recess for 10 minutes. We'll be back. All rise. This court is in recess for 10 minutes. Thank you.
judges: Pregerson, Fisher, Berzon